NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                        :
KARA KOZLA,                             :
                                        :
                    Plaintiff,          :
                                        :
        v.                              :        Civil Action No. 16-0631-BRM
                                        :
CAROLYN W. COLVIN,                      :
Acting Commissioner of Social Security, :
                                        :
                    Defendant.          :                **OPINION**
_____ :

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Kara Kozla's ("Plaintiff"), appeal from the final decision of the Acting

Commissioner of Social Security, Carolyn W. Covlin ("Defendant" or "Commissioner") denying

Plaintiff's disability benefits under Title II of the Social Security Act (the "Act"). For the reasons

set forth below, the Court **VACATES** the Commissioner's final decision and **REMANDS** for

further proceedings.

**I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

**A.      Procedural History**

On June 6, 2012, Plaintiff filed an initial application for Disability Insurance Benefits,

alleging a disability beginning March 20, 2012. (Tr. 142-43.) The Application was denied on

August 16, 2012 (Tr. 86-90), and denied again upon reconsideration on May 15, 2013 (Tr. 93-95).

Plaintiff subsequently filed a request for a hearing in front of an Administrative Law Judge

("ALJ"). (Tr. 97-98.) Plaintiff's request was granted, and Plaintiff appeared and testified before

ALJ Kimberly L. Schiro on June 17, 2014 ("Hearing"). (Tr. 33-59.) An impartial vocational expert

also testified at the Hearing. (*Id.*) On September 9, 2014, the ALJ denied Plaintiff's Application.

(Tr. 10-27.) On November 7, 2014, Plaintiff filed a request for Appeals Council review (Tr. 6-9), which was denied on December 14, 2015, making the ALJ's decision the final determination of the Commissioner. (Tr. 1-5.) On February 4, 2016, Plaintiff appealed the Commissioner's decision by filing a Complaint with this Court. (ECF No. 1.) The Court received the administrative record on April 11, 2016. (ECF No. 6).

## B. Factual Background

Plaintiff was born on July 9, 1997 (Tr. 142), was 34 years old at the time of her alleged disability onset date, and was 36 years old on the date of the ALJ's decision (Tr. 38). Plaintiff has a graduate school degree, Master of Business Administration (MBA). (Tr. 39.) Plaintiff's first employment, from May 1998 until June 2003, was an Administrative Assistant and Trainer position. (Tr. 162.) From June 2003 to September 2004, Plaintiff was a Head Teacher at a Daycare, in addition to being a self-employed caregiver. (*Id.*) Thereafter, for the next six years, Plaintiff was employed as a Business Office Representative at a medical office. (*Id.*) Plaintiff's most recent employment was from August 2010 to March 2012, when she worked as a Senior Payroll Specialist. (*Id.*) Plaintiff alleges she "stopped working when [she] did because [she] was running low-grade fevers. [She] was in great deal of pain. [She] wasn't able to function. [She] was very ill and [] was having problems with focusing and [she] just wasn't functioning up to the level that was required of [her]." (Tr. 40.)

In a Disability Report, completed in conjunction with Plaintiff's Application, Plaintiff reported being 5'9" and 382 pounds. (Tr. 161.) During the Hearing, Plaintiff testified to being 5'9" and 400 pounds. (Tr. 45.) The Report listed five physical and mental conditions that limited Plaintiff's ability to work: (1) Fibromyalgia; (2) Thyroid issues; (3) Depression; (4) Anxiety; and (5) a Small tear in her rotator cuff. (Tr. 161.)

In a Function Report, also completed in conjunction with Plaintiff's Application, Plaintiff reported: caring for her cats with some help from her mother; caring for her personal hygiene with some difficulty; preparing "fast" meals such as cereal; being able to "push to do small focused tasks"; driving a car; conducting in store and online shopping for medicine, personal care items, household items, and pet supplies one to two times per week; managing her finances; reading, albeit with some difficulty focusing; and socializing with others. (*See* Tr. 171-76.) Plaintiff reported being able to socialize by talking, sharing a meal, watching movies, having coffee, and emailing others ("I try to email daily"). (Tr. 174.) In addition, she reported being able to pay attention for "short periods" of time and follow written direction "fairly ok." (Tr. 175.)

Barbara Cornacchio, Plaintiff's friend, completed a Third Party Function Report. (Tr. 190-97.) She reported knowing Plaintiff her entire life and spending thirty hours per month with her. (Tr. 190). She further reported Plaintiff: (1) "feeds her cats and plays with them" unless she is having a bad day; (2) has "no problem feeding herself" but has difficulty preparing meals (can prepare cereal and sandwiches); (3) "sometimes" folds laundry and picks up her cats' toys; (4) manages her finances; (5) reads and watches movies every day; (6) follows spoken instructions "very well"; and (7) keeps in touch with family and friends via computer on a daily basis. (Tr. 191-95.) She also stated Plaintiff is capable of going "with the flow" when there are changes in her routine, although handling stress could be difficult due to her anxiety. (Tr. 196.)

## C.     Review of the Medical Evidence

Plaintiff claims she has been disabled as a result of fibromyalgia, thyroid issues, depression, anxiety, obesity, and a small tear in rotator cuff since March 2012. (Tr. 161; Pl.'s Br. (ECF No. 9) at 9-10.) In March 2012, Plaintiff was treated by Dr. Andrew Freedman for fever, headache, chest tightness, seeing black floaters, migraines, infrequent urination, and shoulder,

neck, knee, and chest pain with a possible lump. (Tr. 256-57.) During one of Dr. Freeman's assessments, he noted Plaintiff tested positive for antinuclear antibody (ANA) and had fibromyalgia. (*Id.*) The doctor also referred Plaintiff for a mammogram and a radiograph of her left shoulder, both of which revealed normal results. (Tr. 466, 468.)

In April 2012, while still under Dr. Freedman's care, Plaintiff reported tingling in her left hand and fingers, pectoris pain, experiencing an asthma attack, hair loss, and memory loss. (Tr. 253-55.) The doctor's assessments that month reported chest pain, fibromyalgia, asthma, bursitis and positive ANA. (*Id.*) In May 2012, Plaintiff reported increased pain and difficulty getting out of bed. (Tr. 437.) Accordingly, Dr. Freedman diagnosed Plaintiff with Hypothyroid due to Hashimoto's thyroiditis and with fevers. (Tr. 252, 437.) In June 2012, she was diagnosed with left shoulder bursitis and Lupus-"like" symptoms. (Tr. 504-05.) In July 2012, Plaintiff reported paresthesia in both hands and swollen wrists, which caused her to drop things, fevers, visual disturbances, and insomnia. (Tr. 502-03.) On July 9, 2012, an MRI revealed a small left shoulder tear associated with tendinopathy. (Tr. 467.) That month, she was also diagnosed with cervical radiculopathy and lupus. (Tr. 502-03.) In October 2012, Plaintiff complained of increased anxiety and pain throughout her body. (Tr. 500.) In December 2012, she further reported feeling sick and having green mucus. (Tr. 501.) In both January and February of 2013, she reported insomnia, swollen lymph nodes, and muscle spasms. (Tr. 498-99.) At the time, she was further diagnosed with insomnia and eczema. (Tr. 498.)

From approximately March 2012 to June 2012, Plaintiff attended physical therapy at Therapeutics Unlimited. (*See* Tr. 258-274, 293-317.) Overall, therapist assessments revealed "[g]ood symptom relief," positive responses to aquatic therapy, modalities decreasing the pain at the end of the session," decreasing tightness and tenderness in shoulder, ability to perform

isometrics pain free, feeling better after a shot in her shoulder, and improved tolerances for her "ex program and manual tx." (Tr. 258, 261, 271, 301, 313.) Notably, Plaintiff frequently reported her shoulder pain persisted, albeit improving, and she was unable to manage pain for extended time. (Tr. 258, 261.)

Plaintiff was also treated and examined by Alan Lichtbroun, M.D., a rheumatologist. (Tr. 275-92, 318-348) In April 2012, his report noted, in relevant part:

> What changed is that in January she noted fevers up to 100 [degrees] with associated nasal clogging. She usually runs in 97 range. Antibiotics never helped. These low grade temperatures are continuing. She has years of headaches especially in the occiput and then goes around over the eyes. She initially thought it was from depression because she has had these headaches for 10 years. She has a slight rash around the right eye since the fevers in January. She has a long history of asthma. In fact, even today with the pollen count high, she is wheezing in the office.

> Her main pain now however is the left shoulder which has been painful since the January attack to the point where she is unable to abduct the arm. She can flex it better with pain surprisingly in the pectoralis muscle and not the joint itself.

> . . . .

> Physical exam: Neck full range of motion. Slight pain when she rotates to the left which goes into the trapezius. The left arm can only abduct about 120 [degrees] with pain and in fact today she is afraid to even lift it but ironically the pain is in the pectoralis muscle not the shoulder or biceps. The shoulder itself is not tender. She can touch 4 inches above her belt behind her with similar pain. She has all 18 tender points of fibromyalgia.

> Laboratory evaluation: ANA is now even higher than it was last month at 1:160. Unfortunately, they did not do the Lupus panel that we had asked them to do. Temperatures are usually 100 [degrees] max which she feels around dinner. Her left shoulder pain began after the illness with stuffy nose and fever in January. She is noticing hair loss and does get canker sores. Only the left shoulder is the painful area. Sensitivity is something she has had her whole life. She never gets specific rashes.

(Tr. 282-83.)

Plaintiff was also treated by rheumatologist Robert Lahita, M.D. in August 2012, October 2012, and December 2012. (Tr. 475-97.) In August 2012, her chief complaint was that she "[h]urt all over and [was] very tired." (Tr. 495.) In general, the Dr. Lahita found Plaintiff was "[a]lert and oriented," had no acute distress, her ambulation status was within normal limits, she appeared obese, and her behavior was cooperative and anxious. (Tr. 496.) Regarding Plaintiff's musculoskeletal system, Dr. Lahita found a normal range of motion, normal strength, and that her lower extremity and spine/torso was within normal limits. (*Id.*) He further found Plaintiff was "[a]lert, [o]riented, [n]ormal sensory, [n]ormal motor function, has pain in all trigger points 4/5 [and] [h]as pain even in muscles that are not obvious." (*Id.*) Notably, he opined she could ascend and descend stairs and lift packages. (Tr. 495.) Ultimately, he diagnosed her with fever, Fibromyalgia Syndrome, Hashimoto Thyroiditis, and obesity. (Tr. 497.) In October 2012, her chief complaint to Dr. Lahita was pain and fatigue. (Tr. 492.) The majority of Dr. Lahita's examination findings were unchanged. However, he also diagnosed Plaintiff with rheumatoid arthritis. (Tr. 493.) Lastly, during Plaintiff's December 2012 visit, Plaintiff's chief complaint was pain "all over," lack of sleep, and anxiety. (Tr. 489.) At that time, the Dr. Lahita's findings remained largely the same. However, Plaintiff was also diagnosed with Sjogren's syndrome by Dr. Lahita. (Tr. 490.)

From January 2013 to April 2014, Plaintiff was treated by pain specialist Edwin Perez, M.D. (Tr. 606-33.) On multiple occasions, Plaintiff indicated that ever since the medication management for her fibromyalgia "she is able to concentrate more." (Tr. 637, 630.) In January 2013, she reported her pain at "6/10" and stated this was an improvement. (Tr. 630.) In February 2013, that pain increased to "7/10" (Tr. 627), and eventually to "9/10" in March 2013 (Tr. 624). In the proceeding visits, Plaintiff's pain levels fluctuated from 6 to 9 out of 10. (Tr. 609-21.)

Throughout Dr. Perez's notes, he emphasized Plaintiff's "medical condition is complicated by morbid obesity, possible rheumatologic disease, hypertension, tear and rotator cuff, [and] thyroid disease." (Tr. 620, 622, 625, 628.) On several occasions, he noted Plaintiff displayed pain in "11/18 classic fibromyalgia points." (Tr. 620, 622, 628, 631).

Plaintiff was also treated by psychiatrist Boris Borodulin, M.D., from November 2013 to May 2014. (Tr. 638.) Consistently, during that span of time, his objective findings were:

> Speech: relevant, coherent, goal oriented. Orientation: oriented x3. Thought process: organized, circumstantial. Hallucinations: denies. Delusional ideas: denies. Mood: depressed, anxious, dysphoric. Affect: broad, anxious, labile, tearful, appropriate to thought content. Ideation: admits suicidal. Insight: fair. Judgment: fair. Memory: intact. Problems with: concentration, attention span.

(Tr. 640-41.)

On April 18, 2014, at the request of Plaintiff's attorney, Dr. Borodulin completed a check-the-box medical assessment of Plaintiff's ability to do work related activities. (Tr. 634-37.) He opined Plaintiff's ability to make occupational, performance, and social adjustments was rated "Poor or None." (*Id.*)

Two government requested consultative examinations were also conducted of Plaintiff. In July 2012, psychologist Anna Marie Resnikoff, Ph.D., observed Plaintiff was "casually dressed and adequately groomed." (Tr. 470.) She further noted her "speech was clear, unevenly paced and easy to understand." (*Id.*) Plaintiff maintained good eye contact with the examiner, had "no difficulty in walking in and out" of the examination room, and "no difficult remaining seated for the examination." (*Id.*) Plaintiff was able to respond to simple numerical calculations, perform on serial sevens, identify the names of five common objects found around the room, and recall the names of the same five objects. (*Id.*) However, Plaintiff subjectively reported difficulties with her attention, concentration and memory skills. (*Id.*) Plaintiff was oriented and displayed no signs of

thought disorder. (*Id.*) She also denied having any suicidal or homicidal ideas, intent, plan or attempts, but reported suicidal ideation. (*Id.*) No hallucinations, delusions, obsessions or compulsions were reported. (*Id.*) Plaintiff did present "word retrieval difficulties," but demonstrated "[g]ood organizational and retrieval skills of learned materials." (Tr. 470-71.) Lastly, "[w]hen presented with questions that were intended to assess her social planning ability and capacity to formulate practical judgment [Plaintiff] had no difficulty responding to these questions." (Tr. 471.) Ultimately, Dr. Resnikoff diagnosed Plaintiff with depressive disorder (NOS), anxiety disorder (NOS), underactive thyroid, and chronic pain. (*Id.*) She further assessed Plaintiff's Global Assessment of Functioning (GAF) at 50. (*Id.*)

The second consultative examination was conducted by Kim Arrington, Psy. D., in April 2013. (Tr. 591-94.) She found Plaintiff's "demeanor and responsiveness to questions were cooperative." (Tr. 592.) Plaintiff's "manner of relating, social skills, and overall presentation were adequate." (*Id.*) She too found Plaintiff's hygiene and grooming were fair. (*Id.*) Plaintiff's posture, gait, and motor behavior were normal. (*Id.*) Plaintiff's speech was "intelligibly" fluent. (*Id.*) Notably, Plaintiff's "attention and concentration were intact." (*Id.*) "She was able to do counting, simple calculations, and serial 3's." (*Id.*) In addition, her "recent and remote memory skills were intact." (*Id.*) Dr. Arrington's "Medical Source Statement" found:

> With regard to the daily functioning of the claimant, she is able to follow and understand simple directions and instructions. She is able to perform simple tasks independently. She is able to maintain attention and concentration. She is able to learn new tasks and perform complex tasks independently. She would be able to maintain a regular schedule due to support and structure due to her fatigue. Any difficulties may be attributable to depression and anxiety. The results of the present evaluation are consistent with psychiatric problems, which in and of themselves are not significant enough to interfere with the claimant's ability to function on a daily basis.

(Tr. 593.) Dr. Arrington further diagnosed her with: (1) mood disorder, (2) Fibromyalgia, (3) Hashimoto disease, (4) migraines, and (5) asthma. (*Id.*) Lastly, she assessed Plaintiff's GAF at 50. (*Id.*)

Lastly, four agency physicians reviewed the record and drafted reports: (1) Psychologist Ellen Gara; (2) Nancy Simpkins, M.D; (3) Marry Ann Nicastro, M.D.; and (4) Sharon Flaherty, Ph.D. Dr. Gara reviewed the record and opined Plaintiff's mental impairments caused moderate restriction in her daily living activities and maintaining concentration, persistence or pace. (Tr. 65.) There were no difficulties in maintaining social functioning and no decompensation, each of extended duration. (*Id.*) Dr. Gara's Mental Residual Functional Capacity Assessment found: no significant limitations in her ability to understand and remember short and simple instructions; no evidence Plaintiff's impairments caused limitations in her ability to understand and remember detailed instructions; moderate limitations in her ability to remember locations and work-like procedures; no significant limitations in her ability to carry out detailed instructions; moderate limitations in her ability to maintain attention and concentration for extended periods; and moderate limitations in her ability to "complete a normal workday and workweek without interruption from psychologically based symptoms and to perform a consistent pace without an unreasonable number and length of rest periods." (Tr. 68-69.) The report also noted that although Plaintiff alleged issues with completing task and concentration, she was able to do serial sevens and simple numerical calculations. (Tr. 69.)

Dr. Simpkins, also reviewed the record and based solely on her review found Plaintiff could walk for approximately six hours in an eight-hour day; lift ten to twenty pounds for more than one third of an eight-hour day; sit for six hours in an eight-hour day; occasionally climb ladders, ropes, or scaffolds; and perform limited overhead reaching with her upper left extremity. (Tr. 66-67.)

Marry Ann Nicastro, M.D. and Sharon Flaherty, Ph.D., reviewed the updated record (after the four agency physicians reviewed the record and drafted reports). Dr. Nicastro concurred with Dr. Simpkin's opinions. (Tr. 81-82.) Dr. Flaherty mostly concurred with Dr. Gara's opinion. However, she noted Plaintiff had mild difficulty maintaining concentration, persistence, or pace. (Tr. 79-80.)

**D.    Review of Disability Denials**

On June 6, 2012, Plaintiff filed an Application, alleging disability beginning March 20, 2012. (Tr. 142-43.) The Application was denied on August 8, 2012, for the following reasons:

> * You do have pain. However, it does not limit your ability to move about and use your limbs.
>
> * Your condition affects your ability to perform some activities. However, you should be able to take care of your personal needs, do simple jobs when shown and understand and follow simple instructions.
>
> * Although you are not able to do any of the work you have done during the past 15 years, there are other kinds of work you should be able to do.

(Tr. 86-90.)

On May 15, 2013, upon reconsideration, the Application was denied again, in relevant part, for the following reasons:

> * Despite some pain due to your fibromyalgia and rotator cuff tear, you should be able to stand, sit and move about well enough to work.
>
> * You have a thyroid problem. However, it has not damaged any vital body organs, and is not causing any problems which would prevent you from working.
>
> * You have difficulty performing certain tasks. However, you should be able to take care of your personal needs, understand and follow simple instructions and perform simple jobs.

> \* The evidence shows no other condition which significantly limits your ability to work.
>
> We do not have sufficient vocational information to determine whether you can perform any of your past relevant work. However, based on the evidence in file, we have determined that you can adjust to other work.

(Tr. 93-95.) Subsequently, on June 5, 2013, Plaintiff requested a Hearing before an ALJ. (Tr. 97-98). Plaintiff's request was granted, and Plaintiff and a vocational expert appeared and testified before the ALJ. (Tr. 33-59.)

### E. Review of Testimonial Record

#### 1. Plaintiff's Testimony

Plaintiff testified to the details of her medical and employment history at the Hearing before the ALJ on June 17, 2014. She testified to ceasing work in March 2012 "because [she] was running low-grade fevers," experienced "a great deal of pain," was unable to function, felt "very ill" and had problems with focusing. (Tr. 40.) She further contended she was incapable of "functioning up to the level that was required" of her. (*Id.*) Plaintiff testified her pain remained unchanged and to having pain "all over" her body. (Tr. 40-41.) Her pain rate on a scale of zero to ten is regularly a "seven or eight." (Tr. 41.) Plaintiff stated her obesity exacerbates her pain. (Tr. 45.)

Plaintiff testified to driving to local doctor appointments and places with which she is familiar. (Tr. 43.) However, she stated her driving was limited because her medication makes her "sleepy." (*Id.*) Plaintiff also testified to having difficulty standing in the same position for more than thirty minutes because it caused pain in her legs. (Tr. 46.) She contended her ability to walk was restricted to half-a-block to a block, at a slow speed, before having to take a break or slow down. (*Id.*) In addition, she testified to having difficulty sitting in chairs with arms because they exert force on her legs. (*Id.*) However, she admitted that she could sit in a chair that contains back

support and no arms. (Tr. 46-47.) With regard to lifting objects, she testified that she could left a gallon or water, but not carry it very far. (Tr. 47.)

Plaintiff testified to having problems focusing because of her fibromyalgia. (Tr. 48.) She forgets words or statements during conversations. (*Id.*) She also testified to having trouble reading "something . . . because [she] used to read voraciously and then, all of a sudden, [she] won't be able to read at all because [she'll] be mid-sentence and [she'll] have a pain spike somewhere an [she'll] lose where [she] was and [she'll] be on the same page all day and that's frustrating." (*Id.*) Lastly, she testified to being incapable of working for six to eight hours. (Tr. 48-49.)

### 2. Testimony of the Vocational Expert

Tanya Edgehill, employed by the Social Security Administration, testified as the vocational expert ("VE") before the ALJ. (Tr. 52-57.) Based upon her review of a vocational report completed by Plaintiff, she characterized Plaintiff's past employment as: (1) payroll clerk, DOT number 215.382-014, sedentary with a specific vocational preparation ("SVP") of 4; (2) insurance clerk, DOT number 214.362-022, sedentary with an SVP of 5; (3) daycare worker, DOT number 359.677-018, light with an SVP of 4; (4) companion daycare worker job, DOT number 237.367-038, sedentary with an SVP of 4; and (5) medical record clerk, DOT number 245.362-010, light with an SVP of 4. (Tr. 52-53.)

When asked to assume whether "an individual of the claimant's age, education and past work experience . . . who is capable of performing simple/routine tasks at the sedentary exertional level" and "can occasionally climb, balance, kneel, stoop, crouch and crawl" and "make simple/work-related decisions" would be able to perform any of Plaintiff's past work, the VE stated no. (Tr. 53.) However, she noted that there are other occupations that a hypothetical individual could perform, such as: (1) compact assembler, sedentary with an SVP of 2 and existing

in numbers of excess of 150,000 in the national economy; (2) preparer, sedentary with an SVP of 2 and existing in numbers in excess of 140,000 in the national economy; and (3) table worker, sedentary with an SVP of 2 and existing in numbers in excess of 100,000 in the national economy. (Tr. 53-54.)

The VE was also asked to assume whether the jobs would still be available if "the individual would require a five-minute stretch break for every hour of sitting" and answered in the affirmative. (Tr. 54.) When asked whether the jobs remained available if "due to the effects of pain and side effects from medication," the individual had frequent lapses in concentration "such that they would be off task at least 15 percent of the workday" and the VE stated "[t]here would be no jobs with that limitation[.]" (*Id.*) Lastly, she was asked to strike the last limitation and replace it with an individual, who due to the same effects of pain, would require frequent absences from work, meaning two days or more per month on a regular basis. (*Id.*) The VE stated there would also be no jobs with that limitation. (*Id.*)

### F.    ALJ's Findings

Applying the five-step sequential analysis established in the Social Security Act, 20 C.F.R. § 404.1520, to this case, the ALJ first recognized Plaintiff satisfied the first prong of the test in that Plaintiff met the disability insured status requirement of the Act on December 31, 2016, and had not engaged in any substantial gainful activity since March 20, 2012. (Tr. 15.)

In order to satisfy the second and third prongs of the test, the ALJ noted that Plaintiff has the burden of demonstrating she suffered from a "severe impairment" related to her diagnosis of left shoulder bursitis/tendinopathy, obesity, underactive thyroid, myalgia/fibromyalgia, depression, and anxiety and if severe whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1. (Tr. 15-18.) After consideration of the relevant

evidence, the ALJ found Plaintiff's impairments were severe. (Tr. 15.) However, her impairments, individually and in combination, were deemed to fall short of anything listed in Appendix I of Subpart P of the regulations. (Tr. 16-18.)

Turning to the fourth and fifth prongs, the ALJ determined Plaintiff cannot perform any past relevant work (Tr. 25) and concluded Plaintiff

> has the residual functional capacity to perform simple, routine tasks at the sedentary exertional level, which is defined in 20 CFR 404.1567(a). More specifically, the claimant can lift and/or carry up to 10 pounds occasionally, push and/or pull at similar limits, sit for up to six hours in an eight-hour workday, and stand and/or walk for up to two hours in an eight-hour workday. However, she can only occasionally climb, balance, kneel, stoop, crouch and crawl. The claimant can tolerate occasional changes in work tasks and make simple, work-related decisions. Further, she can occasionally reach overhead with the left upper extremity. In addition, the claimant requires a five-minute stretch break for every hour of sitting.

(Tr. 18.)

In making this finding, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the object medical evidence and other evidence, as well as the opinion evidence in the record." (*Id.*) In considering Plaintiff's symptoms, the ALJ followed a two-step process. The ALJ first determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce Plaintiff's pain or other symptoms. (*Id.*) Second, finding an underlying physical or mental impairment(s) had been shown, the ALJ evaluated the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit Plaintiff's functioning. (*Id.*) As the ALJ explained in her decision, "[f]or this purpose, whenever statements about the intensity persistence, or functionally limiting effects of pain or other

symptoms are no substantiated by object medical evidence, [the ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record." (*Id.*)

In her decision, the ALJ noted Plaintiff alleges disability due to fibromyalgia, Hashimoto's underactive thyroid, a small rotator cuff tear, depression, anxiety, and obsessive-compulsive disorder. (*Id.*) The ALJ reviewed Plaintiff's function report and hearing evidence, in which Plaintiff reported her "daily activities and social functioning are significantly restricted by her impairments" and "that she has increased pain, numbness and tingling in her bilateral hands." (*Id.*)

> At the hearing, the claimant testified that she has difficulty finding a position that relieves her pain. In particular, she alleged that she can stand for no more than 20 consecutive minutes before her legs begin to hurt and can only walk approximately half of one block before needing to stop and rest. As for her lifting capacity, she attested that she would not be able to lift a gallon of milk without using both of her hands and would similarly be unable to carry even that limited weight far. Additionally, she noted difficulty with overhead lifting. She also testified that residual effects of her medications cause sleepiness and limit her ability to drive. According to the hearing testimony, the claimant's body habitus further limits her physical capacity. With regard to her mental capacity, the claimant claims she sometimes experiences a "fog" in which she forgets things and cannot maintain focus. In her Adult Function Report, she described trouble completing tasks and having a short attention span. She also stated that her depressive symptoms were worsening in a more recent Appeals Disability Report.

(Tr. 18-19.)

After considering the medical evidence, the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 23.) Specifically, the ALJ explained "[w]hile [Plaintiff's] had a consistent work history within the past 15 years prior to her alleged onset date, which weighs in her favor, [Plaintiff's] daily activities have, at least at times, demonstrated a greater capacity than [Plaintiff]

has alleged." (*Id.*) Although Plaintiff stated she has difficulty lifting groceries and laundry, "she admitted an ability to prepare light meals, shop as needed, manage money, take care of two cats, socialize with family and friends regularly and use a computer on a daily basis for emailing and socializing with others." (*Id.*) In addition, she admitted "being self-sufficient in personal care albeit with some difficulty due to pain symptoms upon bending and reaching at times." (*Id.*) Lastly, Plaintiff attends medical appointments and physical therapy, drives "although she restricts herself from doing so at times secondary to fatigue and pain," and reads despite her allegations "of difficulty maintaining her focus." (*Id.*) Further, the ALJ noted Dr. Borodulin's "highly restrictive assessment" was not "corroborative" of his own progress notes or the treatment records of other physicians. (*Id.*) Accordingly, the ALJ rendered Plaintiff's allegations and testimony less compelling. (Tr. 24.)

Based on the evidence, the ALJ found the overall record did not support the severity of Plaintiff's allegations. (*Id.*) Thus, she found Plaintiff "has not been under a disability, as defined in the Social Security Act, from March 20, 2012." (Tr. 26.).

## II.    STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are

supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). "Substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether

the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id.*

## III.    PLAINTIFF'S CLAIMS ON APPEAL

Plaintiff argues the Commissioner's final administrative decision was not based on the substantial evidence of record, and instead, there is substantial evidence in the administrative record to establish entitlement and eligibility for Social Security Benefits. (ECF 9 at 9.) Specifically, Plaintiff makes two arguments on appeal as to why the ALJ's disability determinations were unsupported by substantial credible evidence. First, she argues the combination of Plaintiff's impairments are medically equivalent to the Commissioner's listings in 20 C.F.R. Pt. 404, Subpt. P., App. 1 and the ALJ failed to "compare the combined effect of all of [P]laintiff's impairments with one or more of the Commissioner's listings." (*Id.* at 11.) Second, Plaintiff argues the decision improperly rejects treating opinions, does not evaluate Plaintiff's pain

according to the Commissioner's protocol, and does not assess the impact of Plaintiff's morbid obesity in the RFC. (*Id.* at 20.)

### A. Whether the combination of Plaintiff's impairments is equivalent to a listed impairment

The listings articulated in 20 C.F.R. Pt. 404, Subpt. P., App. 1, are descriptions of various physical and mental illnesses and abnormalities, categorized by the body system they affect. *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990). All impairments are defined "in terms of several specific medical signs, symptoms, or laboratory test results." *Id.* at 530. "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.*; *see* Social Security Ruling (SSR) 83—19, Dep't of Health & Human Servs. Rulings 90 (Jan. 1983) ("An impairment meets a listed condition . . . only when it manifests the specific findings described in the set of medical criteria for that listed impairment."); 20 C.F.R. § 416.926(a) (1989) (noting that a claimant's impairment is "equivalent" to a listed impairment "if the medical findings are at least equal in severity and duration to the criteria of any listed impairment") "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531–32 (citing SSR 83–19, at 91–92 ("[I]t is incorrect to consider whether the listing is equaled on the basis of an assessment of *overall* functional impairment. . . . The functional consequences of the impairments . . . irrespective of their nature or extent, *cannot* justify a determination of equivalence" [sic]) (emphases in original)).

The Third Circuit requires "the ALJ to set forth the reasons for [her] decision" for her step-three analysis. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). Conclusory statements have been found to be "beyond meaningful judicial review." *Cotter v.*

*Harris*, 642 F.2d 700, 704-05 (3d Cir. 1981). In *Burnett*, the Third Circuit remanded the matter because the ALJ made only conclusory statements without mentioning any specific listed impairments or explaining his reasoning. *Burnett*, 220 F.3d at 119-20 (finding "although [Plaintiff] has established that she suffered from a severe musculoskeletal [impairment], said impairment failed to equal the level of severity of any disabling condition contained in Appendix 1, Subpart of Social Security Regulations No. 4."). In *Torres v. Comm'r of Soc. Sec.*, 279 F. App'x 149, 152 (3d Cir. 2008), the court found "the ALJ failed at step three by failing to consider [Plaintiff's] impairments in combination when determining medical equivalence." Further, the "ALJ failed to combine [Plaintiff's] many medical impairments and compare them to analogous Appendix 1 listings." *Id.* The ALJ's entire analysis consisted of one cursory paragraph stating:

> Regarding steps two and three, the evidence establishes the existence of a "severe" impairment involving left-eye blindness, diabetes, hepatitis C and cirrhosis, degenerative disc disease of the lumbar spine, bronchitis, and depression, but does not disclose any medical findings which meet or equal in severity the clinical criteria of any impairment listed in Appendix 1, Subpart P to Regulations No. 4.

*Id.*

Here, while the ALJ devoted two pages of her decision to her step-three analysis, she only conclusory stated why some of the severe impairments did not individually meet one of the listed impairments. (*See* Tr. 16.) She properly analyzed and articulated why Plaintiff's thyroid condition was not equivalent to listing 9.00, Endocrine Disorders, and why Plaintiff's mental disorders were not equivalent to 13.06. (*See* Tr. 16-18) However, she failed to compare fibromyalgia and obesity to any listing in 20 C.F.R. Pt. 404, Subpt. P., App. 1 and failed to compare fibromyalgia to the listing articulated by Plaintiff, 14.09, Inflammatory Arthritis. Specifically, the ALJ stated:

> For the reasons discussed below, the record fails to establish that the claimant has an impairment or combination of impairments that

meets or medically equals the criteria of any listed impairment. Specific consideration has been given to the applicable sections of 1.00 Musculoskeletal System and 12.00 Mental Disorders of the listed impairments. However, there are no objective findings to meet these Listings.

In addition, SSR 02-1p Obesity was adequately considered both singularly and in combination with the claimant's underlying impairments. As set forth below, the record is absent sufficient evidence that the claimant's obesity meets or medically equals the severity criteria required by a listing. Furthermore, pursuant to SSR 12-2p Evaluation of Fibromyalgia, no treating, examining, or non-examining medical source has documented findings and rendered an opinion that the claimant's fibromyalgia, individually or in combination with any other medically determinable impairment, medically equals the severity requirements of any listed impairment.

(Tr. 16.)

The ALJ failed to mention any specific listed impairments that could possibly relate to fibromyalgia or explain why the medical evidence does not amount to one of the listed impairments. The Court finds that the ALJ's conclusory statements do not allow meaningful review and run afoul of the Third Circuit decisions.

In addition, the ALJ failed to combine Plaintiff's many medical impairments and compare them to analogous Appendix 1 listings. (*Id.*) The ALJ individually analyzed some severe impairments, but failed to combine them and compare them to listed impairments. The only impairments the ALJ combined were the mental disorders. (Tr. 16-18.) Because the Court has no way of reviewing the ALJ's step-three ruling, the Commissioner's final decision is **VACATED** and the case is **REMANDED** to the ALJ for a discussion of the evidence and an explanation of reasoning supporting a determination that Plaintiff's severe impairments are not equivalent to a listed impairment. On remand, the ALJ shall fully develop the record and articulate her findings at step three, including providing several listings that could relate to fibromyalgia, such as 14.09,

and an analysis articulating how the severe impairments in combination do not meet or equal an Appendix 1 listing.

Having decided to remand the case at step three, the Court has no obligation to reach Plaintiff's other arguments at steps four and five. *Vivaritas v. Comm'r of Soc. Sec.*, 264 Fed. App'x 155, 156–57 (3d Cir. 2008) ("Inasmuch as further development of the record and the ALJ's decision based on that record may make consideration of steps four and five of the five-step sequential evaluation procedure unnecessary, we do not reach [plaintiff's] other challenges to the ALJ's decision.").

## IV.  CONCLUSION

For the reasons set forth above, this Court will **VACATE the Commissioner's final determination** and **REMAND** the matter for further proceedings consistent with this opinion.

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**

Dated:  September 26, 2017